IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,   :

v.   :   CRIMINAL INDICTMENT NO.:

DESHALON FLOURNOY   :   1:15-CR-005-SCJ-JSA

   Defendant.   :

## REPORT AND RECOMMENDATION

A grand jury returned an Indictment [1] against Defendant Deshalon Flournoy for possessing a firearm as a previously-convicted felon.  These charges arise from an undercover operation and arrest by Altanta Police Department officers on December 30, 2013, in which the police arrested Defendant for pimping, searched the car he was using and discovered a gun and drugs, and then interrogated him after Defendant waived his *Miranda* rights.  Defendant files Motions to Suppress [14][15], challenging the legality of the warrantless search of the car and the voluntariness of his post-arrest statements.  For the reasons explained below, Defendant's Motions should be **DENIED**.  The undersigned also **RECOMMENDS** that Defendant's newly-filed Motion to Dismiss Indictment For Violation of the Double Jeopardy Clause [30] be **DENIED**.

**Facts**

On the afternoon of December 30, 2013, Atlanta Police Department (APD) Officer Daniel Funderbirk, who was undercover,  was sitting in a parked car in the parking lot of the Airway Motel in Atlanta, when Defendant waved to get his attention.  *See* Transcript of evidentiary hearing, March 5, 2015 [24] ("Tr.") at 5. Defendant at the time was driving a red Dodge Avenger that the police later determined to be registered to another individual residing in North Carolina.  *Id.* at 6, 9, 17, 119; Ex. 10.  Officer Funderbirk stated that he was looking for a prostitute, Defendant instructed Funderbirk to park his car, and Defendant came over to discuss a prostitution transaction.  *Id.* at 7.  The audio and video of this discussion and the events that followed were recorded by equipment in Officer Funderbirk's car, and a DVD containing a copy of the recording was admitted at the evidentiary hearing as Gov't Ex. 1.  The recording clearly shows the Defendant discussing obtaining a prostitute for Officer Funderbirk, and Defendant also offers "whatever you want, hard, weed, pussy, powder heroin . . . weed, kush, mid, whatever."  *See* Ex. 1 at 11:43:00-10.  Officer Funderbirk understood several of these terms to be street jargon for various types of narcotics including marijuana. Tr. at 9.

After Funderbirk and Defendant reached an agreement, Defendant went to retrieve the prostitute and bring her back to Funderbirk's car.  Gov't Ex. 1 at

11:44-45.  After mentioning to Funderbirk that someone else had been driving

around the neighborhood and robbing people at gunpoint, Defendant said words to

the effect that "I don't play no games man.  I keep my pistol on me.  My pistol is in

my car now."  Tr. at 12; Ex. 1 at 11:45:55-59.[1]

 At some point, Officer Funderbirk asked the prostitute whether she had any

_____

[1] Defendant disputes that the recording reflects any statement by him to the effect that "my pistol is in my car now," and he likewise argues that any testimony by Officer Funderbirk in this regard is not credible as the purported statement is not reflected in the recording.  The undersigned has carefully reviewed the relevant section of the recording.  It is true that the Defendant's fast pace and manner of speaking make it difficult to precisely make out everything he says.  And Defendant and Officer Funderbirk talk over each other somewhat during this particular exchange, further obscuring all of Defendant's words.   Nevertheless, the undersigned agrees with the Government, based on the recording, that the Defendant said to Officer Funderbirk that he (Defendant) had a pistol, and "my pistol in my car now."  This corroborates the Officer's testimony, that Defendant stated that he kept a pistol in his car.  While the pace and manner of Defendant's speech make it hard to discern his words with 100% certainty, 100% certainty is not required in adjudicating a motion to suppress.  *See United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.") (*citing Lego v. Twomey*, 404 U.S. 477, 488-489 (1972)).

According to the Government, a review of the recording reveals a second instance in which the Defendant states "I keep my pistol. Mine in my car."  *See* Gov't Br. [34] at 3 (*citing* Gov't Ex. 1 at 11:46:56-59).  In this portion of the recording, the Defendant is standing farther away from Officer Funderbirk's car, his voice is much fainter, and Officer Funderbirk's significantly louder voice (and laughter) tends to drown everything else out.  The undersigned hears what the Government is likely referring to and recognizes that Defendant could very well be saying something about his pistol being in his car.  But in this instance the undersigned cannot conclude to a preponderance of the evidence that this is the case.

"weed," and Defendant responded that he could sell both "mid" and "gas."  Tr. at 12, 40-41; Gov't Ex. 1 at 11:47:00-15.  Officer Funderbirk reached into his pocket and started to pull out money, and he testified that he saw Defendant pull out what appeared to be marijuana and hold it in his hands while at the passenger window of the car.  Tr. at 13, 29, Ex. 1 at 11:47:43-48.  However, while the video shows the Defendant reaching into a pocket and transferring something from one hand to the next, what specifically Defendant was holding cannot be seen from the video.  *See* Ex. 1 at 11:47:56-48:00.  Moreover, another Officer, Officer Bryant, testified that when he came to arrest Defendant, Funderbirk told Officer Bryant that Funderbirk saw Defendant holding marijuana in the backseat of Funderbirk's car, not at the passenger window.  Tr. at 64.

Shortly after the interchange at the car window, marked police units came to the scene to take down the undercover operation, and Defendant asked if he could jump into the backseat of Funderbirk's car.  Tr. at 13.  The patrol officers arrested Defendant and the prostitute and, to preserve his cover, pretended to arrest Officer Funderbirk too.  Tr. at 13-14.  Officer Funderbirk told the officers that Defendant had drugs on this person and drugs and a gun in the car, and that Defendant had procured a prostitute for Funderbirk and had offered to sell Funderbirk marijuana.  *Id.* at 13-14, 50-51.  On the basis of this information, and in particular believing that there was a nexus linking the car to narcotics trafficking and prostitution, the

arresting officers decided to search the car without a warrant.  *Id.* at 50-51, 58, 83.

The officers found bags and tins containing suspected crack cocaine as well as a

black drawstring bag containing a revolver.  *Id*. at 51-54, 74.

      The arresting officers then brought Defendant to APD headquarters, which

was approximately nine miles away.  *Id.* at 55.  The officers handcuffed Defendant

but did not unholster or display their firearms.  *Id.* at 56-57.  Upon arrival, the

officers called for a dog to search the patrol car that brought Defendant to APD.

*Id*. at 15.  The dog alerted to the presence of marijuana and the officers found

marijuana in a plastic bag under a seat cushion next to where Defendant had been

sitting.  *Id.* at 15.  The patrol car was searched that morning before the shift began

and there was nothing in the back seat.  *Id*.  at 74.

      Defendant was taken to an interview room, where he was restrained and

waited for several minutes for an officer to question him. Tr. at 57, 91, 105, 108.

The ensuing events, including the furnishment and Defendant's waiver of his

*Miranda* rights, and the subsequent interrogation, were all recorded and a DVD

copy of the recording was admitted into evidence at the hearing.  Tr. at 91; Gov't

Ex. 6.

<u>**Discussion**</u>

**I.     MOTION TO SUPPRESS**

**A.     Defendant's Challenge to the Search of the Car**

      1.     *Standing*

To have standing to challenge a search, one must manifest a subjective expectation of privacy in the invaded area that "society is prepared to recognize as reasonable." *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978) (quotation omitted); *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998).  The individual's expectation, viewed objectively, must be justifiable under the circumstances. *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979).

Generally, a mere passenger in a car lacks standing to challenge a search. *See Rakas*, 439 U.S. at 140.  However, the courts have held that borrowers of cars have a legitimate expectation of privacy, and have standing to challenge a search, so long as they have the owner's permission to possess the car. *See United States v. Gibson*, 708 F.3d 1256, 1277 (11th Cir. 2013); *United States v. Miller*, 821 F.2d 546, 548 (11th Cir. 1987). A defendant, however, bears the burden of showing a legitimate expectation of privacy in the area searched. *United States v. Ramos,* 12 F.3d 1019, 1023 (11th Cir. 1994).  Thus, a defendant contesting a search of a borrowed car must establish with at least circumstantial evidence that he had the permission of the owner. *United States v. Sanchez*, 943 F.2d 110, 113-114 (1st

Cir. 2010).

"The party alleging an unconstitutional search must establish both a subjective and an objective expectation of privacy. The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable." *United States v. Segura–Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006) (quotation marks and citations omitted).

Here, it is not disputed that the Defendant was in possession of, but was not the registered owner of the car.  During the interrogation, he stated that the car was his "girlfriend's" car.  *See* Tr. at 124.  The police investigation revealed, however, that the registered owner of the car was a particular individual with the initials ES living in North Carolina.  *See* Tr. At 6, 9, 119; Ex. 10.  There was no evidence offered by either side as to who ES is and what if any connection she had with the Defendant or his "girlfriend."  However, the arresting Officer, Officer Bryant, testified that he recalled hearing or learning from something or someone that the car was owned by a relative of the prostitute arrested with Defendant at the scene. *See* Tr. at 55, 66.[2]  Bryant could not recall what the source of his information was

---

[2] In their briefing, the parties both appear to treat it as at least implied that Defendant's "girlfriend" was the prostitute arrested at the scene, and it appears undisputed that she is not "ES."  The Court cannot find any specific testimony to this effect but will assume this fact, which the Defendant asserts and the Government does not appear to dispute, as true.

on this subject, and it could have been that the prostitute herself told him this.  *Id.*

Defendant made assertions referring to the car as "his" in front of the prostitute,

without any apparent objection or contradiction from her, including in the

statements relied upon by the Government stating that Defendant kept a pistol "in

***my car*** right now."  Tr. at 12; Ex. 1 at 11:45:55-59 (emphasis added).

The Government concedes that Defendant established that he had "an actual

subjective expectation of privacy in the car," based on his statements that the car

was his girlfriend's.  *See* Gov't Br. [34] at 11-12.  Nevertheless, the Government

argues that the Defendant lacked an objectively reasonable expectation of privacy,

where such vague information was presented as to the link between the "girlfriend"

and the actual registered owner ("ES"), and no information was presented to show

ES's knowledge or permission as to Defendant's use of the car.

This is a close question, and ultimately the issue of standing is immaterial

because suppression is not warranted on the merits as discussed further in the

pages that follow.  But to the extent any reviewing court disagrees with the

undersigned in that regard, in the interests of efficiency, the undersigned will offer

conclusions on the issue of standing as well.

The Court agrees with the Government that the Defendant has not proven

enough facts to show an objectively reasonable expectation of privacy in the car.

Defendant was not required by any means to testify, although any testimony he

would have offered to establish standing would have been protected by *Simmons v. United States*, 390 U.S. 377(1968).  But on the record here he needed in some way to show more than simply self-serving post-arrest statements referring to the car as his "girlfriend's."  This statement lacked any indication as to what permission he believed he enjoyed, from whom, and specifically why he believed his "girlfriend" (presumably the prostitute arrested at the scene) had the authority to loan the car to him, given that she apparently was not the registered owner herself either.  Indeed, the only evidence offered to suggest that Defendant enjoyed the "girlfriend's" permission to use the car is that the prostitute, who the parties appear to assume to have been the girlfriend, did not appear to specifically respond when Defendant referred to the car as "his" in front of her, at the same time as when Defendant was offering her up to Officer Funderbirk for sexual services.  This record is simply too thin for Defendant to prevail on an issue in which he shoulders the burden of proof. *See also United States v. Sanchez*, 943 F.2d 110, 114 (1st Cir. 1991) (holding that defendant lacked standing where he borrowed a car from a friend who in turn had borrowed it from another friend, and absent evidence showing that the defendant enjoyed "a more intimate relationship with the car's owner or a history of regular use of the [car]."); *See United States v. Smith*, 263 F.3d 571, 586 (6th Cir. 2001) (finding that defendant lacked standing to challenge search of car rented by another person, despite the renter's permission, without the permission of the actual

owner).

Defendant's lack of standing alone would dispose of his challenge to the search of the car. Nevertheless, for the reasons explained above, the Court will also offer alternative findings on the merits of Defendant's motion.

>           2.      The Justification For The Warrantless Search

Generally, a search of any premises in which a defendant enjoys a reasonable expectation of privacy requires a warrant, and the officers did not have a warrant permitting them to search Defendant's "girlfriend's" car here. Nevertheless, the Government argues that the search was justified under the automobile exception to the search warrant. The Court agrees.

Under the automobile exception, a warrantless search of a car is constitutional if (a) the car is "readily mobile" (that is, operational), and (b) probable cause exists to believe that it contains contraband or evidence of a crime. *United States v. Lanzon*, 639 F.3d 1293, 1299–1300 (11th Cir. 2011); *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003). It is undisputed that the car was operational, and Defendant himself points out that he was driving the car immediately prior to the encounter with Officer Funderbirk. *See* Pl. Br. [31] at 1 (*citing* Tr. at 6, 17).

Notably, although Defendant includes various assertions in his statement of the facts refuting that the officers had reason to believe that drugs or a gun were

present in the car, Defendant does not actually make any legal argument that the officers lacked probable cause. In any event, the undersigned finds that the Government has met its burden to show that they did.

Probable cause exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location. *See United States v. Gonzalez,* 940 F.2d 1413, 1419 (11th Cir. 1991). "[P]robable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts[.]" *Illinois v. Gates,* 462 U.S. 213, 232 (1983). Probable cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been. *See, e.g., Whren v. United States*, 517 U.S. 806, 813-4 (1996) ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis."); *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (probable cause is based upon evaluation of the "facts, viewed from the standpoint of an objectively reasonable police officer").

Here, Defendant disputes whether Officer Funderbirk actually saw him holding drugs, or actually heard him refer to drugs being in the car. But it is not disputed – and it is clear from the recordings – that Defendant offered and ultimately agreed to sell Officer Funderbirk narcotics right there on the street at the same time that he was brokering a prostitution transaction. It would have been

reasonable to infer that if the Defendant's drugs were not on his person, they were most likely in the car, which is where he had been seen immediately prior to the encounter with Officer Funderbirk, and which remained in Defendant's sight and under his control during the entire event.  In other words, it was reasonable to conclude that the car had been used at least to transport drugs.

Moreover, as explained above, Officer Funderbirk had probable cause to believe that Defendant had a gun in the car, based on the Defendant's statement that "I don't play no games man.  I keep my pistol on me.  My pistol is in my car now."  Tr. at 12; Ex. 1 at 11:45:55-59.  The gun itself would have evidentiary value even in a mere drug trafficking case, because "weapons have become 'tools of the trade' for those involved in the distribution of illicit drugs...."  *United States v. Alvarez*, 755 F.2d 830, 849 (11th Cir. 1985).  Further, the Defendant's possession of a gun within close proximity while engaging in a drug trafficking transaction would likely also be evidence of a violation of 18 U.S.C. § 924(c)(1).  *See United States v. Young*, 131 F.3d 1437, 1439 (11th Cir. 1997) (possession of a gun in a car used to transport drugs to the scene of a sale supported a conviction under § 924(c)(1), even where the sale did not occur in the vehicle itself, because as "a fact finder in this case could reasonably link the vehicle and the guns to drug trafficking activity . . . .") Thus, probable cause existed that evidence of criminal activity would be found within the car, justifying the search under the automobile

exception.

Defendant argues that the automobile exception should be found inapplicable because he was not "within reaching distance of the passenger compartment at the time of the search," citing *Arizona v. Gant*, 556 U.S. 332, 351 (2009).  *Gant*, however, addressed a separate question, that is, whether and to what extent a car can be search incident to the arrest of a recent occupant.  The Court stated that a car can be searched incident to arrest, but only where the recent occupant was still within reaching distance.  *See id.* at 335, This is inapposite here, where the Government does not claim that it searched the car incident to Defendant's arrest, but rather because probable caused existed that the car contained evidence of criminal activity, thus triggering the automobile exception. The automobile exception is an entirely separate exception from the warrant requirement than the incident-to-arrest doctrine, and does not itself require that any occupant be arrested at all, much less within arms' length.  Indeed, *Gant* itself made clear that it did not affect the validity or scope of the automobile exception, noting that "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820–821, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), authorizes a search of any area of the vehicle in which the evidence might be found." *Gant*, 556 U.S. at 347; *see also United States v. Alston*, 598 Fed. Appx. 730, 733 (11th Cir. 2015) (describing a search of a car incident-to-

arrest and a search under the automobile exception as separate exceptions to the

warrant requirement, even after *Gant*); *United States v. Cole*, No. 1:09-CR-412-

ODE-RGV, 2010 WL 3211027, *12 (N.D.Ga. May 12, 2010) ("'*Gant* did not do

away with the 'automobile exception' to the warrant requirement.'") (*quoting*

*United States v. Ramos–Rogel*, No. 09–40117–01–KES, 2010 WL 1492859, *4

(D.S.D. Apr.13, 2010)).

### B.    Defendant Voluntarily Waived His *Miranda* Rights

After arresting Defendant, the officers took him to the station house and

interrogated him.  The recording of the interrogation was introduced into evidence

as Gov't Ex. 6.  It is not disputed that before any questioning, the officers read

Defendant his *Miranda* rights and he indicated that he would waive those rights

and would agree to speak to the officers.  *See* Tr. at 92-93, Gov't Ex. 6 at 17:51:27-

58; Gov't Ex. 8.  Defendant, rather, argues that this waiver was involuntary,

because "the videotaped interviews of Mr. Flournoy show a man under the

influence of narcotics."  Pl. Br. [31] at 5.  Defendant points to "the scratching of

his face like a dog" while in the interrogation room, and other odd behavior.  *Id.*

While Defendant never stated that he was under the influence of any drugs, he

argues that his intoxication should have been obvious and likely was known to the

officers.  Defendant points to a juncture in the recording where he was scratching

himself so hard that his earring apparently came off, and an officer asked "you

didn't even feel that, did you?"  Tr. at 119-120; Gov't Ex. 6 at 18:45:30.

The Government acknowledges that the record is at least "mixed" on the question of whether Defendant may have been under the influence of something, based on his scratching and apparent sleepiness during some of the questioning, Def. Br. [34] at 23-24.  The Government nevertheless argues that the facts show that, if Defendant was intoxicated, he was not so affected that his consent should be deemed involuntary.

Determining whether a statement and/or waiver of *Miranda* rights is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir.1994); *see Arizona v. Fulminate*, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

It is undisputed that a "a defendant's impaired mental state (whether drug induced or otherwise) may prevent that person from understanding the nature of his waiver . . . ." *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995).

Nevertheless, "[t]he mere fact that the defendant had taken drugs prior to giving the statement does not render it inadmissible." *United States v. Taylor*, 508 F.2d 761, 763 (5th Cir. 1975).  Rather, "[t]he evidence must show the defendant was so affected as to make his statement, after appropriate warnings, unreliable or involuntary."  *Id.*; *see also United States v. Korn*, 138 F.3d 1239, 1240 (8th Cir. 1998) (neither exhaustion nor intoxication will necessarily invalidate a Miranda waiver)  *United States v. Smith*, 608 F.2d 1011, 1012 (4th Cir. 1979) (stating that "[t]he test of whether a person is too affected by alcohol or other drugs voluntarily and intelligently to waive his rights is one of coherence, of an understanding of what is happening," and affirming district court's denial of suppression motion where, despite defendant drinking "enormous quantities of alchohol" in the 24-hours prior to his confession, "he was sober enough to know where he was and to recognize who the people around him were.")

Here, the record as a whole suggests that the Defendant was not so affected by drug use that his statements and waiver were involuntary.  The Court has reviewed the videotape of both the encounter with Officer Funderbirk and the later police interrogation.  The undercover recording shows that Defendant rationally negotiated a prostitution and drug transaction and maintained an extended conversation with Officer Funderbirk in which both parties understood and responded appropriately to each other.

The police station recording shows some odd physical behavior by Defendant, to be sure.  But it also shows that he responded appropriately to the officers' questions, that he was able to provide his name, birthday and address upon request, *see* Ex. 6 at 17:42-43, that he spoke with appropriate detail about the pimping and about the drug activity he was engaged in, *Id.* at 17:52-58, that he knew and could recite details about his criminal history, *Id.*, and that he affirmatively offered to provide information about drug dealing in Atlanta if the police could help him with the potential gun charge he knew he would be facing, and which he knew was the most serious issue he had to deal with, *Id.*  Defendant also offered a detailed fabricated story about how he came into possession of the gun, *Id.* at 18:52-19:01, only to then admit that it was a fabrication when confronted with contrary evidence, at which point Defendant made admissions as to how, from whom, where, and for how much he bought the gun, *Id.* at 19:07-19:09.

Thus, even if Defendant had been using drugs that day, he was sufficiently alert and aware for the Court to conclude that his *Miranda* waiver and ensuing statements were voluntary.  His Motion to Suppress Statements [15] should be **DENIED**.

## II.    MOTION TO DISMISS

It is undisputed that Defendant has already been previously convicted of

possession of a firearm as a convicted felon under Georgia law based on the same events as are at issue in this case.  On June 6, 2015, Defendant filed a Motion to Dismiss Indictment for Violation of the Double Jeopardy Clause [30].[3]

The Fifth Amendment to the United States Constitution "protects defendants against successive prosecutions for the same criminal offense." *United States v. Baptista–Rodriguez*, 17 F.3d 1354, 1360 (11th Cir.1994).  But "identical offenses are nevertheless different for purposes of the Double Jeopardy Clause when they are charged by separate sovereigns." *Id.*  Defendant criticizes at great length, but recognizes the binding nature of this "dual sovereignty" doctrine.  *See* Pl. Br. [30]

---

[3] The Local Rules and the Scheduling Order in this case [8] provided that all motions were to be filed within fourteen (14) days of arraignment.  *See* N.D. Ga. L.R. 12.1B; Scheduling Order [8] at 12.  At the Defendant's request, the Court continued that deadline, which would have been in January 2015, to February 6, 2015 [12]. Defendant's Motions to Suppress Evidence [14] and Statements [15] were timely filed by that deadline.  The Motion to Dismiss [30], however, was filed four months later.  As discussed below, the motion is predicated on testimony that one of the officers offered in the March 5 evidentiary hearing, which appears not to have been known to Defendant's counsel as of the February 6 due date for filing motions.  Nevertheless, the Motion to Dismiss was filed three months after this testimony was adduced, and approximately 45 days after the transcript was published.  This Motion was also filed without any corresponding motion requesting permission to file an out-of-time or additional motion, per the Scheduling Order.  *See* [8] at 11.  The lateness of this Motion is also prejudicial to the timely disposition of this case, because if a new evidentiary hearing were warranted, as Defendant requests, that would potentially delay trial by several more months.  Nevertheless, the lateness of the Motion is ultimately moot because, as explained below, the Motion is meritless and fails to demonstrate that any evidentiary hearing (much less any relief) is warranted.  Thus, even if this Motion were to be entertained, it should be denied.

at 8-11.

Nevertheless, Defendant argues that the Court should recognize and apply a "sham prosecution" or "mere tool" exception to this doctrine. According to Defendant, where the federal government so controls, dominates and manipulates a state government's prosecution of a defendant, the two sovereigns "should be viewed as a single sovereign for purposes of double jeopardy." Pl. Br. [30] at 12, *citing United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1361 (11th Cir. 1997). The Eleventh Circuit has repeatedly declined to reach – and still has not reached – the question of whether a "sham" or "mere tool" exception to the "dual sovereignty" doctrine actually exists, finding instead in case after case that the defendant has not made the requisite factual showing. *See, e.g., United States v. Ducuara de Saiz*, 511 Fed.Appx. 892, 896 n. 2 (11th Cir. 2013) ("Although this court has not squarely decided the validity of the sham-prosecution exception, we need not reach that question because Quintero has not demonstrated a sham prosecution.")[4] This exception has rarely if ever been applied to grant relief to defendants, and a defendant bears a "substantial burden" in showing the requisite level of domination and control. *See United States v. Raymer*, 941 F.2d 1031,

---

[4] The suggestion of a sham prosecution exception has been inferred by some courts based on *dicta* in the Supreme Court's decision many years ago in *Bartkus v. Illinois*, 359 U.S. 121, 123-24 (1959). Yet in the ensuing 66 years the Eleventh Circuit has never been presented with a fact pattern forcing it to decide whether such an exception actually exists.

1037 (10th Cir. 1991).

Defendant here points to the role of Andrew Griffin in the investigation of this case.  Griffin, who testified at the March 5, 2015 hearing, is an Atlanta Police Department Officer and also has been "deputized" as a Task Force Agent with the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  Griffin participated in the APD interrogation of Defendant on December 30, 2013 and is also participating in the federal prosecution team relating to these charges.  Defendant argues that Griffin helped obtain evidence against Defendant wearing his "state hat," and is now part of the team using that evidence against him in his "federal hat."'  Defendant also points out that Griffin advised the state prosecutors to "go ahead and proceed with your case as normal," while he was simultaneously presenting the case to federal prosecutors to try to convince them to take the case, which ultimately they did.  *See* Tr. at 122.  According to Defendant, this instruction had the effect of acheiving a conviction in state court, which can be offensively used against Defendant in this related prosecution in federal court.

Even if a "sham prosecution" exception to the "dual sovereignty" doctrine were to be recognized, however, nothing Plaintiff alleges remotely suggests that the state's prosecution of Defendant was a mere "sham" here.  Even "extensive law enforcement and prosecutorial cooperation between two sovereigns does not make a trial by either a sham." *United States v. Rashed*, 234 F.3d 1280, 1284 (D.C.Cir.

2000); *United States v. Tirrell*, 120 F.3d 670, 677 (7th Cir. 1997) ("Even

significant cooperation between federal and state agencies is not enough to make

the second prosecution a sham.")  (internal citations and quotations omitted);

*United States v. Figueroa-Soto*, 938 F.2d 1015, 1020 (9th Cir.1991) ("As *Bartkus*

makes plain, there may be very close coordination in the prosecutions, in the

employment of agents of one sovereign to help the other sovereign in its

prosecution, and in the timing of the court proceedings so that the maximum

assistance is mutually rendered by the sovereigns."); *United States v. Angleton*, 221

F.Supp. 2d 696, 715 (S.D. Tex. 2002) ("Every circuit to consider the issue has held

that the cross-designation of a state law enforcement agent or district attorney as a

federal official to assist or even to conduct a federal prosecution does not bring a

case within the Bartkus exception to the dual sovereignty doctrine.") (gathering

authority).

Thus, that Griffin was cross-designated as both an APD officer and federal

task force agent does not, in itself, suggest any improper collusion or control

beyond the normal and expected coordination between agencies.  Nor does the fact

that Griffin presented the case for consideration to the United States Attorney.  If

anything, this fact underlies the separateness of these prosecutions, because even

while the state prosecution was underway, the federal prosecutors had not even

made a decision as to whether they would take the case.  That Griffin advised "go

ahead and proceed with your case as normal" to the state prosecutors, while the

federal prosecutors were deciding whether to get involved, reflected nothing more

than prudent common-sense.  Plainly, the state prosecutors could do nothing other

than "proceed with [their] case as normal" until they had reason to consider doing

otherwise.[5]  Again, that the state case was underway and proceeding "as normal,"

while presentations were still being made to the federal authorities and before any

federal decision was made, if anything bolsters, not undermines, the separateness

of these prosecutions.[6]

---

[5] Because the state has a right to prosecute violations of its laws, proceeding
with a properly-initiated criminal case "as normal" would not in itself suggest a
sham, even if at some point the United States Attorney decided that it would
separately prosecute Defendant.

[6] Defendant speculates that the federal authorities co-opted the state
prosecution in order to engineer a plea and conviction that could then be used
against him in the subsequent federal trial.  Putting aside the lack of any concrete
facts in support of this theory, the Court also notes that Defendant is concerned
about something that is not likely to be an issue in this case.  Defendant resolved
his state case by way of a so-called *Alford* or *nolo contendere* plea (*see* Pl. Br. [30]
at 5), which reflects no admissions by him of any facts or of guilt.  While a *nolo
contendere* plea generally operates as conviction just like any other, several courts
have held that "[a] conviction resulting from a nolo contendere plea under these
circumstances [i.e., where there is no admissions of guilt] is not by itself sufficient
evidence to prove [in a subsequent *criminal* case] a defendant committed the
underlying crime."  *United States v. Nguyen*, 465 F.3d 1128, 1131 (9th Cir. 2006);
*United States v. Poellnitz*, 372 F.3d 562, 565 (3d Cir. 2004) (In a criminal case,
"[w]e conclude that the District Court erred as a legal matter in relying on the nolo
plea as evidence of commission of a crime."); *cf. United States v. Krietemeyer*, 506
F.Supp. 289 (S.D.Ill.1980) (*Alford* plea sufficient to establish liability in
subsequent *civil* case).  There is no allegation that the District Attorney objected to
the entry of an *Alford* plea, which, given this caselaw, one would expect if the

Defendant argues that he is at least entitled to an evidentiary hearing to further explore and adduce facts of a possible "sham prosecution."  Given that Defendant has already examined Officer Griffin – the supposed linchpin of this supposed conspiracy – it is unclear, and Defendant does not establish with any specificity, what more evidence he would adduce at a hearing.

In any event, "where a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing independent of the trial to receive evidence on any issue necessary to the determination of the motion."  *United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) (quoting *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984)).  "A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. . . .  A court need not act upon general or conclusory assertions. . ."  *Id*. at 1284 (*quoting United States v. Richardson*, 764 F.2d 1514, 1527 (11th  Cir. 1985) (internal citations omitted)).  Here, Defendant has failed to establish a suggestion that the "sham prosecution" exception applies (were it to be recognized) and has failed to allege even a minimum quantum of facts necessary to support the request for an evidentiary

---

District Attorney were simply acting as a mere tool of the United States Attorney to obtain a clearly preclusive conviction for later use in federal court.

hearing.  Thus, even if Defendant's untimely motion were to be entertained, it should be **DENIED**.

With no other pretrial matters before the undersigned, this case is hereby **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED** this 3rd day of August, 2015.

_____

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE